15 MAG 2574

ORIGINAL

Approved: _____
BENET J. KEARNEY
Assistant United States Attorney

Before: THE HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

U.S. DISTRICT COURT
FILED
JUL 23 2015
S. D. OF N.Y.

DOC # 1

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :     **SEALED COMPLAINT**

        - v. -                    :     Violations of 18 U.S.C.
                                        §§ 371 and 1349
ROBERT LILLY, III,                :

                Defendant.        :

- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        BRYAN GLINKIN, being duly sworn, deposes and says that
he is a Special Agent with the United States Secret Service
("USSS") and charges as follows:

**COUNT ONE**
(Conspiracy to Possess and Present Fictitious Obligations)

        1.    From at least in or about August 2014 up to and
including on or about February 6, 2015, in the Southern District
of New York and elsewhere, ROBERT LILLY, III, the defendant,
together and with others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree together
and with each other to commit offenses against the United
States, to wit, the possession and presentment of false and
fictitious instruments, in violation of Title 18, United States
Code, Section 514.

        2.    It was a part and object of the conspiracy that
ROBERT LILLY, III, the defendant, together with others known and
unknown, would and did, with intent to defraud, pass, utter,
present, offer, broker, issue, sell, and attempt and cause the
same, and, with like intent, possess within the United States
false and fictitious instruments, documents, and other items
appearing, representing, purporting, and contriving through
scheme and artifice, to be actual securities and other financial

instruments issued under the authority of the United States, a foreign government, a State and other political subdivision of the United States, and an organization, in violation of Title 18, United Sates Code, Section 514.

## Overt Acts

3.    In furtherance of the conspiracy, and to effect the illegal objects thereof, the following overt act, among others, was committed in the Southern District of New York:

a. On or about August 26, 2014, ROBERT LILLY, III, the defendant, sold a gift card that had been obtained using a fictitious check bearing the name "Michael Jones Design" to a purchaser.

(Title 18, United States Code, Section 371.)

## COUNT TWO
(Conspiracy to Commit Wire Fraud)

4.    From at least in or about August 2014 up to and including on or about February 6, 2015, in the Southern District of New York and elsewhere, ROBERT LILLY, III, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

5.    It was a part and an object of the conspiracy that ROBERT LILLY, III, the defendant, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

6.    I am a Special Agent with the USSS.  This affidavit is based upon my personal participation in the

2

investigation, my examination of reports and records, and my
conversations with other law enforcement officers and other
individuals.  Because this affidavit is being submitted for the
limited purpose of establishing probable cause, it does not
include all the facts that I have learned during the course of
my investigation.  Where the contents of documents and the
actions, statements, and conversations of others are reported
herein, they are reported in substance and in part, except where
otherwise indicated.

      7.    As part of my investigation, I have spoken with a
Fraud Investigations Manager at a third-party check verification
company for numerous merchants in New York City and the
surrounding area ("Company-1").  Based on these conversations
and my review of documents, I have learned that:

      a. Company-1 provides third-party check verification
services.  As part of these services, Company-1 receives
information from merchants regarding checks tendered at retail
points of sale.  It then compares that information to a database
and, using various factors, determines whether merchants should
accept or decline checks as payment.  If a check that has been
approved by Company-1 subsequently proves to be deficient such
that the merchant cannot collect payment, Company-1 is liable
for the amount of the check.

      b. The Fraud Investigations Manager at Company-1
identified a pattern of checks that, after being accepted by
merchants, were returned by financial institutions with
indications that the bank accounts indicated on the checks did
not exist.  The Fraud Investigations Manager provided me with a
list of checks that the Fraud Investigations Manager had
identified as part of this pattern.  These checks had been
presented to merchants between on or about August 22, 2014 and
on or about February 6, 2015.  These checks bore the names
"Thomas King" or "Michael Jones," among others, or variations
thereof, as the payor.

      8.    As part of my investigation, I have spoken with a
Detective in the Police Department of Upper Merion Township in
Pennsylvania.  Based on these conversations and my review of
documents, I have learned that:

      a. On or about February 6, 2015, in Upper Merion
Township, Pennsylvania, a co-conspirator not named as a
defendant herein ("CC-1"), was arrested for using a check
bearing the payor name "Thomas King Inc." to purchase two $2,000

gift cards, worth $4,000 in total, from a retail location of a merchant ("Merchant-1") in the King of Prussia Mall in Pennsylvania.  At the time that CC-1 was arrested, he was a passenger in a rental car (the "Rental Car") that had been rented and was being driven by ROBERT LILLY, III, the defendant. LILLY was not arrested at that time.

        b. At the time he was arrested, CC-1 provided a telephone number ("CC-1 Phone Number").[1]  At that time, LILLY also provided a telephone number (the "Lilly Phone Number").[2]

        c. At the time of CC-1's arrest, an Upper Merion Township Police Sergeant observed a shopping bag with the logo of Merchant-1 on the floor of the Rental Car near the front passenger seat.  The Rental Car was subsequently searched pursuant to a court-authorized search warrant.  Among the items recovered in connection with that search were the two gift cards that CC-1 had purchased from Merchant-1 on or about February 6, 2015.

        9.    As part of my investigation, I have spoken with employees of the company from which ROBERT LILLY, III, the defendant, rented the Rental Car.  Based on these conversations, I have learned the rental agreement was completed in LILLY's name and that that two telephone numbers were provided on the rental agreement, one of which was the Lilly Phone Number.  An email address (the "Lilly Email Address") was also provided.

        10.   Based on my conversations with the Fraud Investigations Manager at Company-1, my conversations with other law enforcement officers and other individuals, and my review of documents, I have learned the following:

        a. On or about February 5, 2015, at approximately 5:38 p.m., an individual presented a check at a retail location of a merchant ("Merchant-2") in order to make a $2,000 purchase. That check bore the payor name "Thomas King Inc."  The retail location was located in New York, New York.

---

[1] Based on my review of documents, I have learned that the subscriber for CC-1 Phone Number is an individual who has the same last name as CC-1.

[2] Based on my review of documents, I have learned that "Robert Lilly" is the subscriber for the Lilly Phone Number.

b. As part of my investigation, I have spoken with two customer service representatives of Merchant-2 who handled the transaction described in paragraph 10(a) ("Employee-1" and "Employee-2"). Based on my conversations with Employee-1 and Employee-2, I have learned the following:

i.      Employee-1 and Employee-2 each separately viewed a photo array and identified a picture of CC-1 as the individual who made the purchase described in paragraph 10(a).

ii.      Both Employee-1 and Employee-2 recalled that CC-1 had purchased a gift card using a check and had referred to a "driver" who was waiting outside for him.

iii.      After CC-1 completed the purchase, Employee-2 called Merchant-2's loss prevention department. The loss prevention representative recognized the name on the check[3] and instructed Employee-2 to void the transaction and "zero[] out" the balance on the gift card that CC-1 had purchased.

c. On or about February 5, 2015, at approximately 7:01 p.m., an individual presented a check at a retail location of another merchant ("Merchant-3") in order to make a $2,000 purchase. That check bore the name "Thomas King Inc." as the payor. The retail location was located in New York, New York.

d. As part of my investigation, I have spoken with a customer service representative of Merchant-3 who handled the transaction described in paragraph 10(c) ("Employee-3"). Employee-3 viewed a photo array and identified a picture of CC-1 as the individual who made the purchase described in paragraph 10(c).

11.    Based on my conversations with the Fraud Investigation Manager at Company-1, I have learned that the CC-1 Phone Number was used to place numerous phone calls to Company-1 on various dates between on or about August 6, 2014 up to and including on or about February 5, 2015, which were recorded pursuant to Company-1's policy. Based on my review of these calls, I believe that all of these calls were made by the same male speaker, with the exception of one call where a woman

---

[3] Based on my conversations with the Fraud Investigations Manager at Company-1, I have learned that Company-1 had advised merchants that checks with the payor listed as "Thomas King" or variations thereof were potentially fraudulent.

identifying herself as an employee of a merchant is the caller. Based on my review of these calls, I have learned that, during the course of the calls, the caller attempts to have a check approved by Company-1 and identifies himself either as a customer whose check has just been declined or as an employee of the merchant to whom the check has been presented.  As a result of some of these calls, the customer service representative advises the caller to wait several minutes and try to use the check again.[4]

       12.   Based on my conversations with the Fraud Investigation Manager at Company-1, I have learned that Company-1 analyzes a variety of factors to determine whether a particular merchant should accept or decline a check.  This analysis results in a numerical score for each proposed transaction; if the score is above a certain threshold, the check is accepted.  The score for a particular check is not fixed, however.  If, for example, an individual whose check has been declined by Company-1 calls Company-1's customer service department, Company-1's customer service representative, after reviewing a number of factors, has the discretion to give the check "VIP status."[5]  "VIP status" increases the numerical score assigned to the check, which increases the likelihood that it will subsequently be approved by Company-1.

       13.   The following are examples of the calls described in paragraph 11 and subsequent transactions:

       a. On or about August 27, 2014, at approximately 3:54 p.m., the CC-1 Phone Number was used to place a call to Company-1.  During that call, the caller initially identified

---

[4] On other calls, the customer service representative tells the caller not to use the check again, but to use the next check in the sequence.

[5] When evaluating whether to give a check "VIP status," the customer service representative, in addition to noting the routing number, account number, and check number of the check, will also ask for the caller's name and other identification number, such as a drivers license number, in order to determine if the caller has any negative history in Company-1's database. However, when a merchant sends check information to Company-1 for approval, the merchant only provides the routing number, account number, and check number.  Company-1 learns the payor name and any other identifying information only when the check is returned to Company-1.

himself as an employee of a merchant who was assisting a customer who was attempting to pay by check.  He subsequently identified himself as a customer named "Alex Walker" and said, in substance and in part, that he was at a retail location of a merchant ("Merchant-4") in New Jersey.  The caller inquired about a check that had been declined.  The caller provided a check number ("Check Number-1"), an account number ("Account Number-1"), and routing number ("Routing Number-1") associated with the check and stated that the check was for $1,000.  During the call, the customer service representative told the caller that the check had been given "VIP status" and advised the caller to wait five to seven minutes and to try to use the check again at the same location.

        b. On or about August 27, 2014, at approximately 4:09 p.m., a check bearing Check Number-1, Account Number-1, Routing Number-1 and the payor name "Michael Jones Design" was successfully used at a retail location of Merchant-4 in Hackensack, New Jersey to make a $1,000 purchase.  This check was subsequently returned by the financial institution that processed it because the account indicated on the check did not exist.

        c. On or about October 7, 2014, at approximately 11:06 a.m., the CC-1 Phone Number was used to place a call to Company-1.  During that call, the caller identified himself as "Adam Moore" and said, in substance and in part, that he was at a retail location of a merchant ("Merchant-5") in New York.  The caller inquired about a check that had been declined.  The caller provided a check number ("Check Number-2"), an account number ("Account Number-2"), and Routing Number-1 associated with the check and stated that the check was for $1,000.  During the call, the customer service representative told the caller that the check had been given "VIP status" and advised the caller to wait five to seven minutes and to try to use the check again at the same location.

        d. On or about October 7, 2014, at approximately 11:13 a.m., a check bearing Check Number-2, Account Number-2, Routing Number-1 and the payor name "Michael Jones" was successfully used at a retail location of Merchant-5 in Huntington, New York to make a $1,000 purchase.  This check was subsequently returned by the financial institution that processed it because the account indicated on the check did not exist.

e. On or about October 9, 2014, at approximately
11:15 a.m., the CC-1 Phone Number was used to place a call to
Company-1.  During that call, the caller identified himself as
"Adam Stevens" and inquired about a check that had been declined
at a retail location of Merchant-3 in New York.  The caller
provided a check number ("Check Number-3"), an account number
("Account Number-3"), and Routing Number-1 associated with the
check stated that the check was for $1,379.26.  During the call,
the customer service representative told the caller that the
check had been given "VIP status" and advised the caller to wait
five to seven minutes and to try to use the check again at the
same location.

f. On or about October 9, 2014, at approximately
11:22 a.m., a check bearing Check Number-3, Account Number-3,
Routing Number-1 and the payor name "Michael Jones" was
successfully used at one of Merchant-3's locations in White
Plains, New York to make a $1,379.26 purchase.  This check was
subsequently returned by the financial institution that
processed it because the account indicated on the check did not
exist.

14.   Based on my conversations with the Fraud
Investigation Manager at Company-1, and my review of the phone
calls described in paragraphs 11 and 13, I believe that CC-1 was
calling Company-1 in order to obtain "VIP status" for fictitious
checks that had previously been declined so that they would be
more likely to be approved by Company-1 when he later used them
to make purchases.

15.   Based on my conversations with the Fraud
Investigation Manager at Company-1, my conversations with other
law enforcement officers and other individuals, and my review of
documents, I have learned the following:

a. On or about August 26, 2014, at approximately
11:57 a.m., an individual presented a check to Merchant-4 in
order to purchase two $500 gift cards ("Gift Card-1" and "Gift
Card-2").  That check bore the payor name "Michael Jones Design"
and was subsequently returned by the financial institution that
processed it because the account indicated on the check did not
exist.

b. On or about August 26, 2014, at approximately
2:13 p.m., an individual presented a check to Merchant-4 in
order to purchase a $1,000 gift card ("Gift Card-3").  That
check bore the payor name "Michael Jones Design" and was

8

subsequently returned by the financial institution that
processed it because the account indicated on the check did not
exist.

        c. Gift Card-1 was used by an individual
("Individual-1") to make purchases on or about August 26, 2014
and on subsequent dates.  Gift Card-3 was used by Individual-1
to make purchases on or about August 27, 2014 and on subsequent
dates.

        d. Gift Card-2 was used by an individual
("Individual-2") to make a purchase on or about August 27, 2014.

        e. As part of my investigation, I have spoken with
Individual-1.  Based on my conversations with Individual-1 and
my review of documents, I have learned the following:

        i.      In or about August 2014, Individual-1
saw an online advertisement offering to sell two $500 gift cards
that were redeemable at Merchant-4 for $600 total.  Individual-1
contacted the seller and arranged to purchase the gift cards.

        ii.      Individual-1 met with the seller of the
gift cards in person at a location in New York, New York and
bought Gift Card-1 and Gift Card-3 from the seller.  Individual-
1 provided a physical description of the seller.[6]  Individual-1
also viewed a photo array and identified a picture of ROBERT
LILLY, III, the defendant, as resembling the seller of the gift
cards.

        iii.     Individual-1 used an online payment
service to pay for the gift cards.  In connection with this
transaction, the seller's name was provided as "Robert Lilly"
and the seller's email address was the Lilly Email Address.

        iv.     Individual-1 was able to spend the $500
value of Gift Card-1 and the $1,000 value of Gift Card-3.

        f. As part of my investigation, I have spoken with
Individual-2.  Based on my conversations with Individual-2 and
my review of documents, I have learned the following:

---

[6] I have reviewed photographs of both CC-1 and ROBERT LILLY, III,
the defendant.  Based on my review of these photographs I
believe that the physical description provided by Individual-1
matches LILLY and does not match CC-1.

    i.  Individual-2 saw an online advertisement for gift cards and agreed with the seller of the gift cards to pay $600 for $1,000 worth of gift cards.

    ii.  Individual-2 communicated with the seller of the gift cards via text message.  The seller used the Lilly Phone Number.

    iii.  Individual-2 used an online payment service to pay for the gift cards.  In connection with this transaction, the seller's name was provided as "Robert Lilly" and the seller's email address was the Lilly Email Address.

    iv.  In exchange for $600, the seller provided Individual-2 with photographs of Gift Card-1 and Gift Card-2.

    v.  When Individual-2 attempted to use Gift Card-1, Individual-2 discovered that its value had already been redeemed.  Individual-2 was able to spend the $500 value from Gift Card-2.

   WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of ROBERT LILLY, III, the defendant, and that they be arrested and imprisoned or bailed, as the case may be.

          _____
          BRYAN GLINKIN
          Special Agent
          United States Secret Service

Sworn to before me this
23 day of July, 2015

_____
THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK